Good morning, Your Honors. You may proceed. Thank you, Your Honors. My name is Kim Dieter. I represent the appellant in this case, Andrew Bus. I'd like to reserve approximately two minutes for While you do so, we'll just watch the clock. Thank you, Your Honors. There are three basic issues presented on this appeal. One, the first one, is whether or not Border Patrol Agent Sadler effectuated a staff which would implicate the Fourth Amendment in his contacts with Ms. Dubas. The second issue, which is really the heart of the appeal, is whether or not it was a staff. It was supported by reasonable or articulable suspicion in this case. And finally, the subsequent search that took place, the question is whether or not that was lawful. And certainly that Well, why don't we go straight to the reasonable suspicion issue. Let's assume, without deciding at the moment, unless you want to pursue it, that there was a staff. Yes. What about the Fourth Amendment issue? Well, in that case, the test would be, it's a Terry staff, that the officer needed to have a reasonable or articulable suspicion in order to substantiate lawfully the staff of Ms. Dubas. I would submit that he did not. He had a variety of assumptions or hunches, and some of them were an assumption upon an assumption, which led him to his suspicion. First of all, he is on, and it's a little complicated. I don't know how clear the map is, but if you look at the road he's talking about, the 9 Mile Molson Road, it's shaped like a horseshoe. The top half of it, let's say it's 12 o'clock at the very top, a couple of miles from the border, very close to the border. And at the bottom, there's the Molson-Cheesaw Highway, which is a public paved highway that runs east and west, intersecting at the bottom. Now, where are the two sensors? The two sensors that were discussed in this case were at approximately the first one that went off at 245 was at approximately, say, 11 o'clock on that horseshoe. It would have been on the west top half of that road. The second one that went off at 6 o'clock was to the east of that sensor, and I don't know how clear the record is as far as the distance between those two sensors. But I would say then certainly it's between 11 o'clock and 12 o'clock on the top of that horseshoe. So they're both close to the border. They're both very close to the border. The officer testified that the sensors are on the road itself. They go off. They're sensitive to metal, their magnet, and so they indicate if anybody drives on that road, residents or not. The agent never saw a vehicle, not even Ms. DuBasse's vehicle, never saw a vehicle on that road. He made the assumption there was a vehicle because he saw lights reflected in the fog, which to him were an indication of headlights. He chose to follow. He turned his lights off to follow that light source. The lights went off. He followed, and when he got to the main road, because at that point he was off the road, when he got to that road, the horseshoe road, he decided to head in an easterly direction. Based upon the fact that the other sensor to the west had not gone off, he would assume if the person had gone in that direction, that sensor would have gone off. And based on the direction of the light source. The sequence of the sensors was the westernmost, then the next one to the east of that. Correct, Your Honor. So the whole movement is toward the east. Correct. So he followed with his lights off that road for a certain extent. He didn't see any activity whatsoever, and he ends up at the intersection of the highway and that road. When he, about 20 minutes later, when he approaches the intersection, and he hasn't even stopped there. And again, it's around 6.30 in the morning. He testified that it was dark, the sun was rising, and there were patches of fog. He sees a minivan driving lawfully on a public highway. There was nothing suspicious about that vehicle. And he assumed that that was a vehicle that may have been on that nine-mile road. And we would submit that nine-mile area is an area that's notorious for alien and drug smuggling. However, there are residences that are on that road as well. So simply by virtue of being on that road. First of all, we're talking about early in the morning or the middle of the night, so to speak, within a few miles of the border. And there's no other traffic. Correct. It's a road that's likely traveled, right? I would assume it's off of the main highway, but there are residences there. People go to and from work. I thought there was something in the record that it's a very lightly traveled road. There's not much traffic on it. I don't recall. I would submit that that's quite possible. I don't recall those exact words, but it is off the main highway. It's a rural area. Sparsely populated. Sparsely populated, correct, Your Honor. The first sensor went off at 2.45. If he had come upon the vehicle at 2.45 on that nine-mile road, maybe we'd have a different argument. But the facts in this case are different. What we have is a sensor going off again at 6, and he sees the green minivan at approximately 6.30. And I would submit to the Court that 6.30 is not an odd time to be on the road. And many people travel on America's highways at 6.30 in the morning on their way to some lawful activity. That does not support a reasonable suspicion. The officer testified that he wanted to see what the driver's reaction might be to him. Testimony is also that the Border Patrol car that he was driving did not have emergency lights from the front of the vehicle. He wouldn't be able to tell it was law enforcement. It wasn't marked on the front. It was the insignia of the Border Patrol was on the side. Is it one of those light green-colored vehicles? Yes, it's white with green trim. All right. So he follows. He indicated that her speed, his estimation of her speed on the highway, was 45 to 50 miles an hour. He thought it was a reasonable rate of speed. He testified that when she turned onto Dry Gulch Road that her speed was between 40 and 45 miles an hour. Now, that's a dirt road. And that's a dirt road, Your Honor. But it's also a very wide road. There are pictures of that road in the record, and there were patches of fog. The officer, at this point, is making he wants to see what her reaction is. There's an assumption that the driver of the car even knew law enforcement was behind. Patches of fog. It's dark. The vehicle's not marked from the front. There are no lights, no spotlights. There's nothing to support his assumption that she may be alluding based upon the possibility that maybe she knows it's law enforcement behind her. Another assumption upon an assumption upon an assumption. No. Didn't he say he thought she was speeding, given the circumstances? He said he thought she was going too fast. But it's also interesting to note her speed, based on his testimony, decreased when she turned onto the Dry Gulch Road, which would not indicate she was speeding up to allude him. Again, a couple of assumptions piled on top of each other. He stated when he called headquarters, I don't know if I have a local resident in a hurry here or whether or not I've got somebody that may be trying to allude me. Now, I would submit that one of the factors that the court can consider is whether or not an individual is trying to allude law enforcement. But it has to be obviously alluding law enforcement. And I believe that comes from the Supreme Court case of, pardon me, Virginoni-Ponce, and that would be 422 U.S. 873. That case also deals with – well, actually, I'm below two minutes, Your Honor. I'll reserve for later. Thank you. You may do so, counsel. We'll hear from the government. Thank you. Good morning. May it please the Court. I'm Jared Kimball for the United States. I'm an assistant U.S. attorney from Spokane, Washington. Your Honor, I would, I guess, phrase the issue for the Court in response to Ms. Dieter's arguments, that the record here, as Judge Whaley found at the trial court level, was the court of finding solidly that there was no seizure or stop on these facts. And as I argued to Judge Whaley back in court when we presented this issue, it's a stop without a stop. And so to short circuit or shortcut the work of this Court in determining the merits of the appeal, I would ask Your Honors to examine whether or not the Fourth Amendment is truly implicated by the fact pattern we have before you today. Well, you've got here a situation where she wants him to move the car so she can leave. That's correct, Your Honor. So we've got either a stop or a seizure, I think. You know, it's an interesting issue, Your Honor. And Judge Whaley, I think, went through the process of analyzing that. And what Judge Whaley determined in his order was that the result of Ms. Dubas driving up a residential dirt road, a ranch road, abruptly turning around to head back down the road, the Border Patrol Officer Sadler's response of following her up to see what she was doing, they're coming together head on. Officer Sadler, I believe, backed up first. The defendant tried to go around him. She backed up. And they both got out of the car at the same time. Wait a minute. Wait a minute. But didn't she say, would you get out of my way? I want to get by? She did say that. She did. He said, I want to ask you a couple questions. Yes. And he wouldn't let her get by. That's correct. Those actions don't amount to a seizure? Right there? I don't think so, Judge. Because under the Kim decision out of Hawaii, the issue for a seizure and a seizure What is that? Is that that driveway case? No. It's the case where the DEA had a tip about informant with some narcotics. They ended up approaching the person in a public, I think, a public shopping area. Wait a minute. Okay. One of the DEA vehicles was partially parked behind the suspect. Right. The court, this court, in that case, said that the issue of analysis for seizure and a stop under the law, the standard was, I guess, somewhat lowered if you're hindering future progress versus current progress. And it makes sense. If I'm driving and I see lights in the rear of your mirror, I'm being ordered to the side of the road, or if I'm approached and detained, it is my movement is abruptly stopped. The process of invoking the protections of the defendants. Now, Hsu, Hsu's abruptly stopped, but I think your case is what? He didn't do it intentionally? I think that's right. I think that's what it amounts to. It depends on his state of mind. But we know his state of mind doesn't matter, does it? Well, I'm not sure that's true, but I would go back to the Kim case because the Court was fairly convinced that there was no Fourth Amendment implication on those facts because the defendant had stopped himself. And even in that case, there was some partial blocking in by the officer, far more intrusive action by having him get out of the car, separating defendants for questioning, that sort of thing. I'd a lot rather hear about reasonable suspicion. Sure, Your Honor. In fact, this will be helpful to me. If you just tick off the factors that you believe gave rise to reasonable suspicion. Sure, Judge. And then we can maybe argue about those, or she can argue with the bottom. I do stand by my arguments that there wasn't a seizure here at the outset, but I'm happy to move on. I appreciate that. I appreciate that. Judge, I would say that. And I appreciate that Judge Whalen made that finding, too. Thank you. I do want to stress that on the second issue, the case that seems to be most compelling is Arvizu. And I'm talking about the Supreme Court's version in 2002, not this Court's version of 2000, which counsel cited, which was overturned by the Supreme Court. The factors that seem to be compelling, which are similar to the Arvizu case, would be the proximity of the border, which is a matter of record, the fact that seismic and or metallic sensors are going off, not once but twice, the time of the day. It's between initially 2.45, then it's around 6 a.m. The nature of the vehicle, honestly, I'm not sure that is an overly persuasive and controlling factor. It was a minivan. The officer in this case testified that he typically sees rental cars, minivans, SUVs. So that fact is present, although I don't think it's the most persuasive. The issue of traffic, Officer Sadler testified specifically he had not seen one vehicle, not one vehicle the entire time he was up by the border, to include his route through the very small town of Molson, if you want to call it a town, and back down to the more substantial highway. The actions of the officer in terms of following Ms. Duboss to try to engage her reaction, I think, are also compelling. The Border Patrol officer in the Arvizu case had the same thought. And what is interesting is that in this case, despite an innocuous presence, and I say innocuous because we've seen cases where law enforcement, maybe to their detriment, has used high beams or they spotlight the person or they follow too closely and they almost bring about the erratic behavior on the defendant's part. Here this Border Patrol officer says, I'm just following her to see what she's going to do. I don't have any bright high beams, no spotlight, no light bar on top of my truck. And in response to just the vehicle being behind her by the testimony of the agent, she turns onto a dirt road, which is Dry Gulch Road, again sparsely populated. And she continues to drive through dense fog, accelerating away from the officer to the point that he feels he has to break off his following of her. He tries to close the distance when the fog alleviates and there's patches of clearing to the point where he cannot close the distance because she's moving away from him. Well, he takes that as a suspicious factor. He does, and rightfully so. She then, as was seen in the case, I believe, in Arvizu, where the driver there made some inconsistent driving patterns, such as signaling but then not turning, et cetera. Ms. Dubas, in this case, abruptly, and abruptly indicated by the competency of this record, i.e., taillights on, nose of her car dipping substantially, takes an abrupt left turn of someone's ranch driveway, immediately does a rapid U-turn to come back down to where the Border Patrol agent is driving up. And as Judge Whaley found, I would say correctly, he found, A, that it wasn't a stop. It wasn't a Fourth Amendment-implicated issue. However, at that point, the eluding behavior certainly tipped the scale to where we would expect nothing else of the officer to say, wait, wait, wait, what's going on? Where are you headed? You know, what is your business? So in terms of a citizen contact, in terms of the nature of the detention, and these cases are all driven by the facts, obviously. There's very little on this record to suggest an oppressive, aggressive, or, I guess, the type of police presence that would be complicated for the record. No weapons were drawn. He didn't take his flashlight out and shine it on her. He simply opened his door as she opened hers and says, what is your business? What's going on here? And I would ask the Court to find that on those records, there's really very little to show that the officer acted improperly. And I would, just for the benefit of the record, and since Judge Tshishima is here, this is a substantially different set of facts than the Sigmund Ballesteros case, which Judge Tshishima authored. In that case, he had the Border Patrol parking off the side of the road in an unknown narcotics area, but parked at an angle so that the Border Patrol lights of the vehicle would definitely get in the eyes of any passing vehicle. And the officer there said he wanted to gauge reaction to basically being temporarily blinded by the headlights. That officer tailed. He used his side, his headlights on his vehicle, the side light, to illuminate further the cab of that car, which was distracting to the drivers. You just don't have those kind of facts on this record. You have a culmination, a series of events, arriving in a crescendo with the attempt to elude and very reasonable behavior by the agent, in my humble view, which very Do you want to say anything about the consent to the search? Briefly, Your Honor, I would. Looking again at that issue in the standard announced by the Supreme Court in the Schneckloff case, it does appear in these facts that it was a voluntary consent. The factors are, I think, well known to the Court. There's no show of force. There was no weapons drawn. There were no threats made or promises, inducements to cooperate. There was only one officer. There were not several. These are facts that, in large part, really distinguish it from a situation where a person would feel coerced or pressured. Did he have a sidearm? I'm sure that he did. He said he was in full uniform. I'm assuming that would include his weapon. It's also a matter of record. I'm certain he did not ever unholster it. But he didn't, like, put his hand on it. Nothing on the record says, like, he put his hand on it. Nothing on the record says he put his hand on it. But my understanding, and, you know, from the record and the demeanor of the witness and the nature of the questioning, this is not an antagonistic or confrontational interaction. It was very quick. It was very, in terms of how it unfolded at the point that the defendant revealed the contents of her vehicle. But there's no suggestion it was an aggressive presence by law enforcement. Thank you. Thank you, counsel. Ms. Dieter, you have some reserved time. Thank you, Your Honor. Just briefly, to summarize, there is substantial case law that talks about it, again, as Mr. Kimball has stated, and accurately so. These cases are fact-driven. And the reviewing courts have to look at the totality of the circumstances. But there is, obviously, quite a bit of guidance out there. And, you know, officers are allowed to rely on experience and training as part of their rationale for deciding to pull somebody over to effectuate a stop. United States v. Montero-Camargo says that this court has stated that we would defer to officers' inferences only when such inferences rationally explain how the objective circumstances aroused a reasonable suspicion. And I would submit to you that the officer had several assumptions and several hunches. He didn't know for sure what he had. It was all assumption-based. And, again, layers upon layers of different assumptions. But reasonable suspicion requires a lot less than probable cause. Certainly. Certainly would grant. So I think some assumptions, when you're looking at reasonable suspicion, are allowed. Certainly, Your Honor. But also, when there is a suspicion based on an officer's determination, it can't rely solely on generalizations that, if accepted, would cast suspicion on large segments of the law-abiding population. And that is in the Manzo-Wardo decision of this circuit, where they were – there was the case involving the individuals at the football stadium in Montana, where the court found that there was not reasonable suspicion. Your Honor, I think I'm done. Thank you, counsel. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision.
judges: B. Fletcher, O'scannlain, Tashima